<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                    :
DAVID MARTIN and LUISA MARTIN,      :
                                    :
            Plaintiffs,             :
                                    :        Civil Action No. 18-02511
v.                                  :
                                    :        **OPINION**
HUDSON FARM CLUB, INC.; LUKAS       :
SPARLING; and GRIFFIN & HOWE, INC.,:
                                    :
            Defendants.             :
_____:


**CHESLER**, District Judge

        This matter comes before the Court on the motions for summary judgment filed by

Defendants Hudson Farm Club ("HFC") and Lukas Sparling (collectively, the "HFC Defendants"),

and Defendant Griffin & Howe, Inc. ("G&H" and, collectively with the HFC Defendants,

"Defendants"), respectively, as to certain affirmative defenses which Defendants have asserted,

pursuant to Federal Rule of Civil Procedure 56, and the motion filed by Plaintiffs David and Luisa

Martin ("Plaintiffs")[1] to strike those same affirmative defenses.  As described, *infra*, the Court will

convert Plaintiffs' motion to strike into a competing motion for summary judgment concerning

Defendants' affirmative defenses.  The Court has reviewed the papers submitted and proceeds to

rule without oral argument, pursuant to Federal Rule of Civil Procedure 78.  For the reasons that

follow, Plaintiffs' motion for summary judgment will be granted and Defendants' motions for

summary judgment will be denied.

_____

[1]        Unless otherwise specified, references to "Martin" in this Opinion concern David Martin.

## I. BACKGROUND[2]

On September 19, 2017, Martin participated in a charitable clay shooting event at HFC in Andover, New Jersey.  (Pls.' 56.1 Statement ¶ 1, 22–23; HFC 56.1 Statement ¶ 1; G&H 56.1 Statement ¶ 1.)  Upon arriving at HFC, Martin signed a Release and Hold Harmless Agreement (the "Release"), which consists of three "Sections" on a single page.  (Pls.' 56.1 Statement ¶ 2; HFC 56.1 Statement ¶ 8; G&H 56.1 Statement ¶ 2.)  Section I of the Release reads:

> **I HAVE BEEN ADVISED THAT THE RECREATIONAL USE OF FIREARMS IS AN INHERENTLY DANGEROUS ACTIVIT WHICH CAN AND DOES RESULT IN SERIOUS BODILY INJURY AND/OR DEATH ESPECIALLY IF SAFETY RULES ARE NOT OBEYED**
>
> In return for the use of the premises and equipment, I agree to indemnify, hold harmless and defend [G&H], [HFC] and [non-party] IAT Reinsurance Company Ltd. and its instructors, employees, directors, officers, agents, representatives, heirs, successors, and assigns from and against any and all claims, demands, causes of action, personal injury (including death), damages, costs, and expenses (including attorney's fees), arising out of, related to, or connected with the rental of a firearm, instruction, use or discharge of firearms.  I hereby further agree, on behalf of myself, executors and assigns, that I will not make any claim or institute any suit or action at law or in equity against [G&H], [HFC] and IAT Reinsurance Company Ltd. Related [sic] directly or indirectly to my use of the firearm referenced in this document or from my use or participation in any activity on this

---

[2]    As relevant to the instant motions, and as discussed further *infra* at Section II.A, the following papers and their attendant exhibits establish the evidentiary record:

- In connection with Plaintiffs' Motion ("Pls.' Mot.") (ECF No. 124), Plaintiffs submitted a Rule 56.1 Statement ("Pls.' 56.1 Statement") (ECF No. 139), the HFC Defendants submitted a Response to Plaintiffs' Rule 56.1 Statement ("HFC's 56.1 Response In Opp.") (ECF No. 143), and the G&H Defendants submitted a Response to Plaintiffs' Rule 56.1 Statement ("G&H's 56.1 Response In Opp.") (ECF No. 144).

- In connection with the HFC Defendants' Motion for Summary Judgment ("HFC Mot.") (ECF No. 122), the HFC Defendants submitted a Rule 56.1 Statement ("HFC's 56.1 Statement") (ECF No. 122-2).

- In connection with the G&H Defendants' Motion for Summary Judgment ("G&H Mot.") (ECF No. 123), the G&H Defendants submitted a Rule 56.1 Statement ("G&H's 56.1 Statement") (ECF No. 123-2).

property.  I expressly assume the risk of taking part in the activities on the premises, which include the discharge of firearms and firing of live ammunition.

Section II is entitled "FIREARM RENTAL USE" and requires that the signatory attest that they are "not subject to any of the disabilities set forth in N.J.S.A. 2C:58-3," concerning the purchase of firearms, and further requires that the signatory certify to other statements relevant to the individual's rental of a firearm.[3]  Section III is entitled "CONSENT FOR USE OF LIKENESS." While Sections I and II bear Martin's signature, Section III does not.

By his signature to Section I of the Release, Martin acknowledged that "[he] carefully read this agreement and fully underst[ood] its contents," (ii) that he was aware that the Release was an important legal document, and (iii) that he intended to be "fully bound by it."  (Pls.' 56.1 Statement ¶ 16; HFC 56.1 Statement ¶ 9; G&H 56.1 Statement ¶ 4.)  Notwithstanding this, Martin testified that he signed the Release without reading it.[4]  (HFC 56.1 Statement ¶¶ 10–11; G&H 56.1 Statement ¶ 5; Martin Dep. Tr. at 44:3-25.)

The clay shooting event had multiple starting stations at which the charity participants would begin their shooting activities.  (HFC 56.1 Statement ¶ 2; G&H 56.1 Statement ¶ 6.)  While the charity participants at certain locations walked to those locations, others—including Martin— were transported to their starting location in wagons pulled by vehicles.  (Pls.' 56.1 Statement ¶¶ 26; HFC 56.1 Statement ¶¶ 10–11; G&H 56.1 Statement ¶ 6.)  Defendant Sparling drove the

---

[3]     These include, among other things, that a signatory certify that he or she (1) has "never been convicted of a crime," (2) has "not consumed alcohol in the last 12 hours and [is] not under the influence of any prescription or other drug or substance that would affect my ability to safely handle a firearm," and (3) "know[s] of no reason(s) why [their] possession of a firearm would not be in the interest of public health, safety, or welfare."

[4]     In connection with the instant motions, Martin submits an affidavit attesting that he did in fact read the release.  (*See* Affidavit of David Martin (ECF No. 129-4) ¶¶ 16–20).  For the reasons discussed, *infra* at II.A.2, the affidavit and all attendant facts will be set aside as a sham affidavit.

vehicle which pulled the wagon in which Martin rode.  (HFC 56.1 Statement ¶ 3; G&H 56.1 Statement ¶ 8.)  In route to the station, the tractor ascended an incline and, during the ascent, the vehicle stalled.  (HFC 56.1 Statement ¶¶ 10–11; G&H 56.1 Statement ¶ 9.)  While Sparling engaged the vehicles' brakes, the vehicle and attached wagon began skidding backwards.  (HFC 56.1 Statement ¶ 4; G&H 56.1 Statement ¶ 9.)  Martin at some point during the descent leapt from the wagon and suffered injuries as a result.  (HFC 56.1 Statement ¶ 5; G&H 56.1 Statement ¶ 10.)

## II.   DISCUSSION

Defendants bring their motions pursuant to Federal Rule of Civil Procedure 56 seeking summary judgment as to their respective affirmative defenses of release and waiver as a result of the Release, while Plaintiffs' motion is styled as a motion to strike those affirmative defenses. Notwithstanding that the Parties have pursued motions under different rules, those motions concern solely the validity of the Release.[5]

Rule 12(f) of the Federal Rules of Civil Procedure, concerning a motion to strike, allows this Court to strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" in a pleading.  Fed. R. Civ. P. 12(f).  However, a motion to strike may be treated as a motion for partial summary judgment under Rule 56(d) when facts outside the pleadings are offered.  *See, e.g., United States v. Manzo*, 182 F. Supp. 2d 385, 395 n.6 (D.N.J. 2000) (*"Because both parties refer to matters outside the pleadings and for the sake of consistency and clarity, the Court will generally treat the motion to strike as a motion for summary judgment."); *see also* 5A Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1380, at 647

---

[5]      On July 1, 2021, Magistrate Judge Waldor adopted a briefing schedule proposed by the Parties and ordered that the Parties file "any motions regarding the Release and Hold Harmless Agreement" pursuant to that schedule.  (ECF No. 124.)

("[S]ome courts, when faced with affidavits on a Rule 12(f) motion to strike a defense, have treated the motion to strike as one for partial summary judgment.").

In addition to the Parties' initial submissions indicating their apparent understanding that they intended the Court to consider their motions on the evidentiary record established over the past three and a half years, the Court on October 1, 2021 ordered that the Parties comply with Rule 56(a) in setting forth that evidentiary record.  In light of the facts presented in the various Rule 56.1 Statements and declarations and in consideration of the arguments set forth in the voluminous briefing before the Court, it makes little sense to treat Plaintiffs' motion as a Rule 12(f) motion to strike a defense.  Here, seeing no prejudice to Plaintiffs who have briefed the issue sufficiently and had the opportunity to proffer evidence in support of their arguments, the Court will exercise its discretion and consider Defendant's Rule 12(f) motion to strike as a Rule 56(a) motion for partial summary judgment.

In evaluating the competing motions, the Court applies the well-established legal standard for summary judgment.  Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'"  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  It may not make credibility

determinations or engage in any weighing of the evidence. *Anderson*, 477 U.S. at 255; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

### A. The Evidentiary Record Properly Before the Court.

Once the moving party has satisfied its initial burden, the nonmoving party must establish the existence of a genuine issue as to a material fact to defeat the motion. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). To create a genuine issue of material fact, the nonmoving party must come forward with sufficient evidence to allow a jury to find in its favor at trial. *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by *Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs*, 134 S. Ct. 773 (2014). The party opposing a motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

> 1. *The Court Will Disregard Plaintiffs' Responses to Defendants' Rule 56.1 Statements in Support of Defendants' Respective Motions for Summary Judgement.*

Rule 56(c)(1) expressly requires a party who asserts that a fact is genuinely disputed to support that assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  If the non-movant fails to "properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).  In the District of New Jersey, Local Civil Rule 56.1 imposes an additional requirement on both movants and non-movants related to summary judgment motions.  The party moving for summary judgment must file a statement which lists, in separately numbered paragraphs, material facts the movant asserts are not in dispute, with citations to the specific portions of the record supporting those factual assertions.  In turn, the party opposing summary judgment "shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion."  L. Civ. R. 56.1(a).  Indeed, the local rule warns that "any material fact not disputed [in such a responsive statement] shall be deemed undisputed for purposes of the summary judgment motion."  *Id.*

On August 23, 2021, in connection with Plaintiffs' Motion (ECF No. 124), Plaintiffs submitted, among other things, the certification of their counsel, Howard R. Engle.  (ECF Nos. 124-1; 124-3.)  Mr. Engle's certification, which purported to be factual in nature, consisted of (i) facts not within his personal knowledge, (ii) legal arguments, and (iii) conclusions of law. (ECF No. 124-1.)  Furthermore, in connection with Plaintiffs' September 15, 2021 opposition to Defendants' respective motions, Plaintiffs submitted "Certification[s] and Statement[s] of Undisputed Facts" by Mr. Engle.  (ECF Nos. 129-1; 130-1.)  These documents were far from the

"responsive statement[s] of material facts" required pursuant to Local Rule 56.1(a).[6]  Rather than

"indicating agreement or disagreement" with "each paragraph" of Defendants' Rule 56.1

Statements as required by the Rules, Plaintiffs proceeded to set forth dozens of their own

purportedly "undisputed material facts."[7]  In light of these procedural improprieties, on October 1,

2021, the Court struck certain certifications which Plaintiffs submitted in support of their Motion

and in Opposition to Defendants Motions and, to establish an orderly recounting of the material

facts, ordered that Plaintiffs file: (i) a statement of material facts not in dispute in support of their

motion, pursuant to Local Rule 56.1(a) and (ii) proper statements of material facts not in dispute

in response to those submitted by Defendants in support of their respective motions.  (ECF

No. 138).

        While Plaintiffs complied with the command to submit a Rule 56.1 statement in support of

their motion, they again failed to submit responses to Defendants' respective Rule 56.1 statements

in a manner which complied with the Rules.  Instead of making a submission consistent with the

Rules, Plaintiffs again submitted statements of purported facts that are unmoored from and

unresponsive to those statements which Defendants submitted.  Plaintiffs have now *twice* failed to

comply with Rule of Federal Civil Procedure 56.1 and Local Rule 56.1—including after the

Court's express order that Plaintiffs do so—by failing to address, on a paragraph-by-paragraph

---

[6]     Indeed, the Rules do not contemplate that a nonmovant will submit a statement of "undisputed" material facts.  Instead, the nonmovant may furnish a "supplemental statement of *disputed* material facts," to which the movant shall reply.  L. R. 56.1(a)

[7]     As just one example, Mr. Engle attests:  "Certainly we know from Mr. Martin's affidavit that he did not read Section 1 and instead skimmed over it precisely because it was 'too small and dense.' Whether this was a reasonable thing to do, given the fact that it was in 9-point font, is a jury question."  (ECF No. 129 ¶ 10.)  Such a statement is far from an "undisputed fact," nor does it follow the plain requirements of Local Rule 56.1(a).

basis, the material facts as set forth in the Defendants' Rule 56.1 Statements.  Plaintiffs have provided no explanation for their repeated and continued violation of the Rules.

However, Plaintiffs' Rule 56.1 Statement in support of their motion—which Plaintiffs submitted pursuant to the Court's October 1 Order—is sufficiently in conformance with Rule 56.1 to allow the Court to consider it in the evidentiary record.  Accordingly, the Court will disregard their responses and will consider Defendants' Rule 56.1 Statements in support of their respective motions as undisputed, except to the extent which Defendants' Rule 56.1 Statements may be tension with Plaintiffs' Rule 56.1 Statement.

2. *Martin's September 16, 2021 Affidavit Will Be Set Aside Under the Sham Affidavit Doctrine.*

In connection with the instant motions, Martin submits an affidavit (ECF Nos. 129-4; 130-4; 133-1; 134-1, the "Martin Affidavit")[8] which Defendants ask the Court to set aside as a "sham affidavit" designed to defeat their motions for summary judgment.  "[I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight . . . ." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (2007) (internal citations omitted).  The timing of the affidavit, whether there is a plausible explanation for the contradictory statements, and whether there is independent evidence in the record supporting the affidavit, may be considered when determining whether an affidavit is a sham.  *See EBC, Inc. v. Clark Bldg. Sys., Inc.,* 618 F.3d 253, 268–69 (3d Cir. 2010).

---

[8]     While the Martin Affidavit was submitted on multiple occasions in connection with the various motions, each submission is identical and the Court will refer to it as a single document.

There can be no dispute that the Martin Affidavit attests to certain facts that are contrary to those which he testified under oath in prior sworn testimony. Martin's deposition testimony clearly evidences that he did not read the Release prior to signing the document:

> [PLAINTIFFS' COUNSEL]: Did you read it before you signed it?
>
> [MARTIN]: No, I did not.
>
> Q. [Counsel for HFC] Why didn't you read it before you signed it?
>
> A. There was about twenty people in line behind me and we were in a press for time to get the events started.
>
> . . . .
>
> Q. So you didn't know what you were signing? —
>
> A. At the time I did not know what I was signing and until I just read it just now, I didn't know what I signed.
>
> Q. You always sign things without knowing what you signed?
>
> . . .
>
> A. From time to time apparently, yes.
>
> Q. Well in this - -
>
> A. In this instance, yes, I did not read it.

(Martin Dep. Tr. at 44:3-25.) Martin now certifies that "he did not read the release entirely before [he signed] it" and that he "tried to read [the Release]" prior to signing the document (Martin Aff. ¶¶ 16–17. Acknowledging that this recounting of the facts is at odds with his prior testimony, Martin goes so far as to assert that "[w]hile [during the deposition] I said I did not read it, what I meant was that I couldn't read the whole thing carefully." (Martin Aff. ¶ 19.) He further asserts that he "was able to skim it and did read what was big enough and what I could understand." (Martin Aff. ¶ 20.)

Counsels' questions—including that which Martin's own counsel posed—during Martin's deposition were perfectly clear, as were his responses. He did not equivocate in his recollection of the facts and repeated it on multiple occasions during the deposition. This is not a discrepancy which merely relates to the weight of the evidence at issue, and instead is a direct contradiction of his prior testimony. *Cf. Jiminez* 503 F.3d at 254 ("[C]orroborating evidence may establish that the affidavit was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition."). Martin cannot now—well after discovery closed and nearly two and half years after he was deposed—contradict his own testimony to give rise to a dispute of material fact in connection with the Parties' competing motions. This is plainly improper, and the affidavit will be set aside as a sham affidavit.[9]

3. *Plaintiffs' Submission of an Affidavit by a Forensic Document Examiner is Improper and Will Be Set Aside.*

In a similar vein, Plaintiffs submit the affidavit of John Paul Osborn, a forensic document examiner, and accompanying exhibits demonstrating Osborn's credentials in connection with the motions. (ECF Nos. 129-3; 130-3; 133-2; 134-2, the "Osborn Affidavit".) This too will be excluded from the Court's consideration in resolving these motions.

Pursuant to Rule 26(a)(2), "a party must make [expert] disclosures at the times . . . that the court orders." Fed. R. Civ. P. 26(a)(2)(D). The disclosures must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the

---

[9]     Counsel for the HFC Defendants assert that Plaintiffs should be sanctioned for submitting this sham affidavit. (HFC Opp. at 7.) To the extent that this request is more than mere bluster, it must be made as its own motion and pursuant to Rule 11 of the Federal Rules of Civil Procedure.

previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case. Fed. R. Civ. P. 26(a)(2)(B). "Expert disclosure requirements are meant to ensure the playing field remains level, to afford the opposing party an opportunity to challenge the expert's qualifications and opinions, and to avoid undue prejudice and surprise." *Bouder v. Prudential Fin., Inc.*, No. CIV.A.06-4359(DMC), 2010 WL 2026707, at *2 (D.N.J. May 21, 2010). Rule 37 of the Federal Rules of Civil Procedure further provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

In evaluating whether a non-disclosure warrants exclusion, the Third Circuit has identified four factors to consider: "(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure the prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation." *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir.2000). The party who has failed to disclose information bears the burden to show that the non-disclosure was substantially justified or is harmless. *See D&D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*, 2006 WL 1644742, at *4 (D.N.J. June 8, 2006). Ultimately, whether to exclude evidence is left to the trial court's discretion. Fed. R. Civ. P. 37(c)(1)(A)-(C); *Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 156 (3d Cir.1995) ("[T]he imposition of sanctions under Rule 37 is a matter within the discretion of the trial court.").

On June 25, 2020, Magistrate Judge Waldor entered an Order which granted Defendants'

Motion to Amend/Correct the Answer to the Amended Complaint regarding Defendants' affirmative defenses relating to the Release.  (ECF No. 82.)  The Order further "permit[ted] any discovery necessary to explore" the defenses.  (*Id.* at 7.)  Plaintiffs subsequently retained Osborn on February 26, 2021.  (Osborn Aff. at 24.)  On June 21, 2021, the Parties reported in a letter to the Court that discovery concerning the Release had been completed.  (ECF No. 118.)

Plaintiffs evidently contemplated prior to the June 21 submission that Osborn may proffer a report in connection with this action, yet openly represented to the Court in the June 21 Letter that discovery was complete.  Plaintiffs offer no explanation as to why the Court should entertain this untimely submission, let alone do they demonstrate why this delinquency is substantially justified or harmless.

Upon consideration of the factors which the Third Circuit outlined in *Nicholas*, the Court finds that exclusion of the Osborn Affidavit is warranted.  This last-minute disclosure is both prejudicial and a surprise.  The Osborn Affidavit was not provided until Defendants were under a deadline to prepare and file their reply brief, and Defendants have had no opportunity to cross-examine the proffered expert's credentials and statements.  Furthermore, allowing Plaintiffs to rely upon the Osborn Affidavit would interfere with the pending motions, and Defendants would be unable to cure such prejudice without the reopening of expert discovery, thus expending additional time, resources and money and further delaying resolution of the motions.  *See, e.g., Brooks v. Price,* 121 Fed. Appx. 961, 965 (3d Cir. 2005).  Whether or not Plaintiffs acted in bad faith, these factors are sufficient to warrant the exclusion of the Osborn Affidavit.[10]

---

[10]     As the Court has concluded exclusion is proper, there is no need to reach Defendants' substantive objections to the Osborn Report.  In any event, for reasons discussed *infra*, the Court's consideration of the Report's contents would not change the conclusion that the Release did not violate the PLRA.

B.  The Release Does Not Violate the New Jersey Plain Language Review Act

New Jersey sets forth certain guidelines regarding consumer contracts—such as the Release—under the Plain Language Review Act ("PLRA"), N.J.S.A. 56:12.  Section 2 of the PLRA requires that a consumer contract "shall be written in a simple, clear, understandable and easily readable way."  N.J.S.A. 56:12-2.  The PLRA is designed so that consumer contracts "use plain language that is commonly understood by the wide swath of people who comprise the consuming public." *Kernahan v. Home Warranty Adm'r of Florida, Inc.*, 236 N.J. 301, 321 (2019). "With such protections in place . . . '[a] party who enters into a contract in writing, without any fraud or imposition being practiced upon him, is conclusively presumed to understand and assent to its terms and legal effect.'"  *Id.* (citing *Rudbart v. N. Jersey Dist. Water Supply Comm'n*, 127 N.J. 344, 353 (1992) (internal citation omitted)).

According to the PLRA, "[a] creditor, seller, insurer or lessor who fails to comply with section 2 of this act shall be liable to a consumer who is a party to the consumer contract for actual damages sustained, if the violation caused the consumer to be substantially confused about the rights, obligations or remedies of the contract . . ."  N.J.S.A. 56:12-3.  The statute sets forth six non-exclusive factors that a court "may consider" in its determination of whether a consumer contract is "clear, understandable and easily readable," including:

> (1) Cross references that are confusing;
>
> (2) Sentences that are of greater length than necessary;
>
> (3) Sentences that contain double negatives and exceptions to exceptions;
>
> (4) Sentences and sections that are in a confusing or illogical order;
>
> (5) The use of words with obsolete meanings or words that differ in their legal meaning from their common ordinary meaning;
>
> (6) Frequent use of Old English and Middle English words and Latin and French phrases.

N.J.S.A. 56:12-10.  Furthermore, the PLRA provides that "[c]onditions and exceptions to the main promise of the agreement shall be given equal prominence with the main promise, and shall be in at least 10 point type."  *Id*.  The Court maintains broad discretion in its determination of how much consideration should be given to the factors individually and collectively.  *Boddy v. Cigna Prop. & Cas. Companies*, 334 N.J. Super. 649, 655 (App. Div. 2000).

Plaintiffs contend that the Release runs afoul of the PLRA in numerous ways and, accordingly, that the Release must be set aside on statutory grounds.  Primary among these arguments is Plaintiffs' contention that the font size in the Release does not meet the requirement that it be "in at least 10 point type."  (Pls.' Mot at 16.)[11]  Plaintiffs further allege that the Release is in violation of the PLRA because it contains:  (i) confusing cross references; (ii) sentences of greater length than necessary; (iii) sentences with double negatives and exceptions to exceptions; (iv) sentences and sections that are in confusing or illogical order; (v) the use of words with obsolete meaning or words that differ in their legal meaning from their common ordinary meaning; (vi) sections that are not logically divided and captioned; and (vii) conditions and exceptions to the main promise of the agreement do not have equal prominence.  (Pls.' Mot. at 17.)

Apart from Plaintiffs' challenge to the font size found within the relevant language of the Release, Plaintiffs' complaints amount to a mere recitation of the PLRA factors and Plaintiffs fail

---

[11]     Relying on the deposition testimony of Laurel Auriemma, G&H's Compliance Officer, Plaintiffs contend that most of the text in Section 1 of the Release is 9-point Times New Roman, the sole exception being the statement "I HAVE CAREFULLY READ THIS AGREEMENT AND FULLY UNDERSTAND THE CONTENTS," found at the bottom of Section 1 of the Release, which Plaintiffs claim is in 8-point Times New Roman.  (Pls.' 56.1 Statement ¶¶ 12, 13, 15, 16.)  Defendants object to these statements as mischaracterizations of Ms. Auriemma's testimony, and instead (correctly) claim that Ms. Auriemma's testimony concerned the font size of a Microsoft Word version of the Release she had in her possession— rather than the signed Release.  (HFC's 56.1 Response In Opp ¶¶ 12, 13, 15, 16; G&H 56.1 Response In Opp ¶¶ 12, 13, 15, 16.)  While the record does not establish an undisputed determination of the relevant language's font size, even when the Court credits Plaintiffs' accounting of the facts, their challenge to the language under the PLRA fails for the reasons that follow.

to establish how these other factors weigh in their favor.  Indeed, upon the Court's review of the Release, it finds that none of these elements exist within the Release.[12]

Even accepting that the font size may be smaller than the 10-point font guideline outlined in the PLRA, the waiver provision in this case is no less prominent than the remainder of the agreement:  The document itself is entitled "SHOOTING SCHOOL AT HUDSON FARM – RELEASE & HOLD HARMLESS AGREEMENT," the waiver provision constitutes Section I of the Release, critical elements of the waiver provision are bolded and capitalized, and the font size of the waiver provision is similar to the font used throughout the one-page document.  The fact that the font size of the relevant language may be marginally smaller than the statutory guidelines does not violate the mandate that the Release be "simple, clear, understandable and easily readable."  *See, e.g.*, *Kang v. La Fitness*, 2016 WL 7476354, at \*10 (D.N.J. Dec. 29, 2016) (finding the waiver provision in the relevant exculpatory clause was no less prominent than the remainder of the agreement where the font throughout the document was "about size 8").[13]

In any event, all of Plaintiffs' complaints are academic:  Martin could not have been confused by the Release *because he never read it*.  Inherent in any violation of the PLRA is that a

---

[12]    Plaintiffs also contend that "Mr. Martin's affidavit alone creates several N.J.S.A. 56:12(1–6) issues of fact."  (Pls.' Mot at 14.)  For reasons previously discussed, the Court will not credit the Martin Affidavit.  *See supra* at II.A.2.

[13]    Plaintiffs' reliance on *Kernahan* and *Rockel v. Cherry Hill Dodge*, 368 N.J. Super. 577 (App. Div. 2004), is misplaced.  To the extent the court in *Kernahan* considered the 6.5-point font size of the relevant language in the 5-page contract, it was one of several factors—also including a "confusing sentence order" and "misleading caption"—weighing in favor of finding it unenforceable.  236 N.J. at 326.  Furthermore, the *Kernahan* decision focused predominantly on the heightened requirements underlying the enforcement of arbitration provisions, an issue not present here.  *Id.* at 301-326 (citing *Atalese v. U. S. Legal Servs. Grp., L.P.*, 219 N.J. 430 (2014)).

Meanwhile, while the court in *Rockel* acknowledged that "[t]he size of the print and the location of the arbitration provision in a contract has great relevance to any determination to compel arbitration," its decision relied largely on the presence of two conflicting arbitration provisions.  368 N.J. Super. at 585. Indeed, the court in *Rockel* did not consider any challenge to the language under the PLRA.

contract that is not "clear, understandable and easily readable" must "*cause*[]" a consumer's "substantial confusion" regarding the contents of the contract.  N.J.S.A. 56:12-3 (emphasis added); *see, e.g., Sauro v. L.A. Fitness Int'l, LLC*, No. 12-3682, 2013 WL 97880, at *12 (D.N.J. Feb. 13, 2013) (citing *Bosland v. Warnock Dodge. Inc.*, 396 N.J. Super. 267, 279 (App. Div. 2007), *aff'd on other grounds*, 197 N.J. 543 (2009)) ("New Jersey courts have held that a . . . plaintiff must allege that she was 'substantially confused' about the contract's terms, as 'substantial confusion' is 'a requirement of the Plain Language Act.'").  Accordingly, the Release could not have served to "substantially confuse" Plaintiff, and his challenge under the PLRA must fail as a matter of law.

## C.  The Release is Unenforceable Against Plaintiffs.

As a general and long-standing matter, contracting parties are afforded the liberty to bind themselves as they see fit.  *See Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 356 (1931); *Walters v. YMCA*, 437 N.J. Super. 111, 117–18 (App. Div. 2014) ("The Court must give 'due deference to the freedom to contract and the right of competent adults to bind themselves as they see fit.'").  However, certain categories of substantive contracts, including those that contain exculpatory clauses, are disfavored and thus have been subjected to close judicial scrutiny.  *See Stelluti v. Casapenn Enterprises, LLC*, 203 N.J. 286, 303 (2010) (citing 11 *Williston on Contracts*, § 30:9, at 103–04)  New Jersey courts have identified four considerations pertinent to the enforcement of an exculpatory agreement, advising that such an agreement:

> will be enforced if (1) it does not adversely affect the public interest; (2) the exculpated party is not under a legal duty to perform; (3) it does not involve a public utility or common carrier; or (4) the contract does not grow out of unequal bargaining power or is otherwise unconscionable.

*Id.* at 304 (quoting *Gershon, Adm'x Ad Prosequendum for Est. of Pietroluongo v. Regency Diving Ctr., Inc.*, 368 N.J. Super. 237, 248 (App. Div. 2004)).[14]

      1.   The Release is Inimical to the Public Interest as Applied to Plaintiffs' Claims

The common law imposes a duty of care on business owners to maintain a safe premises for their business invitees because the law recognizes that an owner is in the best position to prevent harm.  *Id.*  at 306 ("[B]usiness establishments in New Jersey have well-established duties of care to patrons that come upon their premises.").  In light of this duty, "[t]he law does not favor exculpatory agreements because they encourage a lack of care."  *Gershon*, 368 N.J. Super. at 247. But "public policy does not demand a per se ban against enforcement of an exculpatory agreement based on the mere existence of a duty recognized in the common law in respect of premises liability."  *Stelluti*, 203 N.J. at 306.  "[T]he law recognizes that for certain activities conducted by operation of some types of business, particularly those that pose inherent risks to the participant, the business entity will not be held liable for injuries sustained so long as [the business] has acted in accordance with 'the ordinary duty owed to business invitees, including exercise of care commensurate with the nature of the risk, foreseeability of injury, and fairness in the circumstances.'"  *Id.* at 307 (quoting *Hojnowski v. Vans Skate Park*, 187 N.J. 323, 340–41 (2006)). For example, "[w]hen it comes to physical activities in the nature of sports—physical exertion associated with physical training, exercise, and the like—injuries are not an unexpected, unforeseeable result of such strenuous activity."  *Id*.

---

[14]    The third factor is inapplicable here because Defendants are neither public utilities nor common carriers.

Defendants cite Justice LaVecchia's dissent in *Hojnowski* to argue that "recreational activities such as skateboarding do not implicate the public interest" and therefore clay shooting—itself a recreational activity—cannot implicate the public interest. (HFC Opp. at 14-15.) Defendants' position would result in a *per se* enforcement of unbounded waivers of liability in the context of recreational activities, which is plainly contrary to New Jersey jurisprudence.  As the *Stelluti* court acknowledged, there remains a standard for liability even in contact recreational sports.  *Id*. at 311 ("[T]here is also a limit to the protections that a private fitness center reasonably may exact from its patrons through the mechanism of an exculpatory agreement.").  In particular, *Stelluti* requires that business owners be held "to a standard of care congruent with the nature of their business."  *Id* at 312.

The scope of the liability that may be waived in connection with recreational activities was explored in *Walters*.  437 N.J. Super. 111.  There, the Appellate Division considered the enforceability of an exculpatory agreement where a patron at a fitness club sued the club for personal injuries he sustained when he slipped and fell on an allegedly negligently maintained stair tread leading to club's pool.  *Id*. at 118–19.  The hold harmless provision within the patron's membership agreement released the club for injuries sustained by the patron "WHILE ON ANY **YMWCA** PREMISES OR AS A RESULT OF A **YMWCA** SPONSORED ACTIVITIES [SIC]."  *Id*. at 116 (emphasis in original).  In refusing to enforce the broader clause of the exculpatory agreement—concerning injuries sustained "while on any YMWCA premises"—the Appellate Division found that "if applied literally, [the clause] would eviscerate the common law duty of care owed by defendant to its invitees, regardless of the nature of the business activity involved." *Id*. at 118–19.  This, the *Walters* panel continued, "would be inimical to the public interest because it would transfer the redress of civil wrongs from the responsible tortfeasor to

either the innocent injured party or to society at large, in the form of taxpayer-supported institutions." *Id.* at 119.  While the court refused to enforce this broader reading of the exculpatory agreement, it still proceeded to consider whether the patron's injury fell within the ambit of the narrower exculpatory clause.  *Id.* at 120 (finding that an accident resulting from slipping on the steps leading into the pool did not occur while the plaintiff was "using the pool" and thus was not a "sponsored activit[y]" covered by the exculpatory agreement.).

Similar to the waiver at issue in *Walters*, if the terms of the Release are applied literally—to "any activity" on the property—Defendants would be released from any claim arising while an invitee was on the property "regardless of the nature of the business activity involved." *Id.* at 118–19.[15]  Such a broad waiver of liability then constitutes an exculpatory agreement that is "inimical to the public interest." *Id.* at 119.

While the literal reading of the Release cannot be sustained, Defendants are free to craft a release with regard "to a standard of care congruent with the nature of their business." *Stelluti*, 203 N.J. at 312.  To that end, other exculpatory clauses within the Release are tailored to the nature of Defendants' business insofar as they limit the release to firearm-related activities.  (*See* Release ("In return for the use of the premises and equipment, I agree to indemnify [Defendants] from and against any and all claims . . . arising out of, related to, or connected with the rental of a firearm, instruction, use or discharge of firearms;" "I hereby further agree . . . that I will not make any claim or institute any suit . . . directly or indirectly to my use of the firearm referenced in this document

---

[15]     To underscore this point, John Ursin, G&H's attorney and a principal drafter of the Release, during his deposition was asked whether the language was meant to "include every possible accident on the activity." (Ursin Dep. Tr. 27:15-23.)  While he declared that this would be an "overstatement," he only offered the hypothetical the Release was not intended to disclaim liability "if . . . there was a plane crash on the property."  (*Id.*)  To limit Defendants' liabilities under the exculpatory to acts of god would "eviscerate" the duty of care they have to their patrons. *Cf. Walters*, 437 N.J. Super. at 118–19.

. . .;" or "I expressly assume the risk of taking part in the activities on the premises, which include the discharge of firearms and firing of live ammunition.").)  The question thus becomes whether Martin's injury occurred in connection with a firearm-related activity.[16]

New Jersey courts narrowly construe exculpatory waivers in light of *Stelluti*'s admonition that they are disfavored.  *Walters*, 437 N.J. Super. at 328 ("Any ambiguities in language about the scope of an exculpatory agreement's coverage, or doubts about its enforceability, should be resolved in favor of holding a tortfeasor accountable.").  Courts will enforce an exculpatory clause where a claim is "not an unexpected, unforeseeable result of" the risky activity offered by a facility. *Stelluti*, 203 N.J. at 307; *see, e.g.*, *Pulice v. Green Brook Sports*, 2017 WL 3013086 (N.J. Super. Ct. App. Div. July 17, 2017) (finding a fitness club's release enforceable as to plaintiff when a ten-pound dumbbell fell on her face as her trainer handed it to her to perform an exercise); *Skarbnik v. Life Time Fitness, Inc.*, 2021 WL 3923270, at *4 (N.J. Super. Ct. App. Div. Sept. 2, 2021) (upholding fitness club's release where plaintiff slipped on sweat immediately following a hot yoga class, because sweat on the floor "was a natural consequence" of the activity); *Kyung Pak v. NJ Fitness Factory, Inc.*, No. A-5084-16T2, 2018 WL 1865462, at *1 (N.J. Super. Ct. App. Div. Apr. 19, 2018) (release enforced when a fitness club employee directed plaintiff to step onto a running treadmill during an exercise class); *Kang,* 2016 WL 7476354, at *10 (release enforced where plaintiff injured while using a fitness machine).  By contrast, New Jersey courts will set aside exculpatory clauses where a potential claim arises from an activity that is not squarely within the ambit of the risky activity offered by an establishment. *See, e.g.*, *Walters*, 437 N.J. Super. at

---

[16]    Plaintiffs argue unconvincingly that, because the Release does not contain a severability clause, the Release must be voided as a whole.  Here, striking the unenforceable portions of the Release still "leaves behind a clear residue that is manifestly consistent with the 'central purpose' of the contracting parties, and that is capable of enforcement." *Jacob v. Norris, McLaughlin & Marcus,* 128 N.J. 10, 33 (1992).

111 (accident resulting from slipping on the steps leading into the facility's pool not considered a "sponsored activity" subject to the release); *Crossing-Lyons v. Towns Sports Int'l, Inc.*, 2017 WL 2953388, at *1 (N.J. Super. Ct. App. Div. July 11, 2017) (release inapplicable where plaintiff tripped over a weight belt left on the floor, an "incident[] that could have occurred in any business setting"); *see also Martinez-Santiago v. Public Storage*, 38 F. Supp. 3d 500 (D.N.J. 2014) (refusing to enforce exculpatory agreement where patron sustained slip-and-fall injuries on ice on a walkway at a self-storage facility).

Defendants contend that "transportation while at HFC" constitutes an activity associated with sporting clay shooting, and the injury occurred within the scope of the Release. (*E.g.* HFC Mot. at 14.) In making this argument, Defendants analogize sporting clay shooting to golf, with G&H contending that transportation by way of a tractor and wagon is "similar to a golf event" insofar as it was "necessary so that the participants could stagger their starting locations. ((G&H Mot. at 6.) ("To find that attending a sporting clay event does not include transportation from one station to the next is like finding that playing golf does not start until golfers tee off, ends as soon as they retrieve their balls from the cup, and does not begin again until they tee off, and so on. Sporting clay shooting, like playing golf, includes all of the activities associated with attendance at the event, including transportation throughout the course.").) These arguments "ignore[] the cause of the accident." *Walters,* 437 N.J. Super. at 120. Here, the "inherent risky nature" of Defendants' firearm business was immaterial to the injury Martin suffered. Martin's injury occurred while he was being transported in a tractor-pulled wagon to his starting shooting location. The Release, while clearly referring to various elements of *using* a firearm—such as the "rental, instruction, [or] use . . . of firearms" and "discharge of firearms and firing of live ammunition"—

does not self-evidently concern transportation while on the property.[17]  Much like the Appellate Division's refusal to consider  "an accident resulting from slipping on the steps leading into the pool . . . covered under the 'activities' part of" the release clause in *Walters*, Plaintiffs claims do not arise in connection with the activities involved with using a firearm.  437 N.J. Super. at 111. Instead, Plaintiffs' claims are more akin to a "garden variety" personal injury action.  *Id*. Accordingly*,* the exculpatory clause of the Release is void and unenforceable as to Plaintiffs' claims.[18]

> 2.  Even if the Release Applied to the Wagon Ride, Disputes Over Material Facts Would Preclude Summary Judgment.

Even if the Court accepted that transportation to the shooting range is covered under the Release, the application of the final factor relevant to the enforcement of an exculpatory clause under New Jersey law—that the contract does not grow out of unequal bargaining power or is otherwise unconscionable—gives rise to a dispute of material facts.  *Gershon*, 368 N.J. Super. at 248.  "Procedural unconscionability requires examination of 'unfairness in the formation of the

---

[17]    Further to their proposed analogy between transportation during sporting clay shooting to the rental of golf carts in connection with a golf tournament, Defendants offer *Post v. Belmont Country Club, Inc.*, 60 Mass. App. Ct. 645 (2004) as support for their argument that injuries during transportation should be covered within the Release.  However, in *Post*, the relevant exculpatory clause in the golf membership handbook *expressly* included transportation on the golf court, *id.* at 646, and applied Massachusetts' more permissive rules with respect to exculpatory agreements, *id.* at 651 (refusing to require "strict construction" of the relevant exculpatory clause when asked to apply other states' rules of construction).

[18]    Plaintiffs also argue, unpersuasively, that the Release violates Defendants' statutory duties imposed upon them under New Jersey Code of Criminal Justice, Title 2C Section 2C:58-3.1.  Under 2C:58-3.1, a legal owner of a handgun, rifle or shotgun may temporarily transfer the firearm to a person who is 18 years of age or older, if the transfer is made upon a firing range "for the sole purpose of target practice, trap or skeet shooting, or competition upon that firing range."  Upon the transfer, "[t]he firearm shall be handled and used by the person to whom it is temporarily transferred only in the actual presence or under the direct supervision of the legal owner of the firearm."  *Id.*  Plaintiffs make no claim that any injury was the result of a failure to supervise him upon the transfer of a firearm, and Martin has acknowledged that he was not in possession of a firearm during the wagon ride at issue.  (Martin Dep. Tr. 51 5-12.)

contract' while substantive unconscionability considers whether the contract's terms are 'excessively disproportionate." *Marcinczyk v. State of New Jersey Police Training Com'n*, 406 N.J.Super. 608 (2009).  In ascertaining whether a contract is unconscionable, these substantive and procedural aspects are subjected to a sliding-scale analysis. *Delta Funding Corp. v. Harris*, 189 N.J. 28, 40 (2006).

Plaintiffs assert that the Release is substantively unconscionable insofar as it should "shock the Court's conscience" that "Defendants sought to release themselves from all responsibility to paying guests at their business." (Mot. at 31.)  Courts routinely uphold exculpatory releases, particularly concerning recreational activities, and Plaintiffs offer no meaningful argument as to how the Release departs from other exculpatory releases in such a manner as to shock the conscience.

Similarly, many of Plaintiffs' arguments underlying their claim of procedural unconscionability fall flat.  As previously noted, the purpose of the PLRA is to enable the courts to "confidently state that, even in the consumer context, '[a] party who enters into a contract in writing, without any fraud or imposition being practiced upon him, is conclusively presumed to understand and assent to its terms and legal effect.'"  *Kernahan v. Home Warranty Adm'r of Florida, Inc.*, 236 N.J. 301, 321, 199 A.3d 766 (2019).  Among other things, Plaintiffs argue that (i) Martin's "lack of education and sophistication rendered him unable" to enter into the release; (ii) the Release was not negotiated personally by Martin; and (iii) he lacked representation by counsel.[19]  Setting aside the impracticalities that would result if the Court accepted Plaintiffs'

---

[19]     The Release, which Defendants presented on a take-it-or-leave-it basis, in a standardized printed form, and without opportunity for the Martin to negotiate, is a contract of adhesion. *Gamble v. Connolly*, 399 N.J. Super. 130, 142 (2007) (A contract of adhesion means "'a contract where one party must accept or reject the contract.'").  However, "'the determination that a contract is one of adhesion is the beginning, not the end, of the inquiry into whether a contract…should be deemed unenforceable based on policy considerations.'" *Id.*  "When making the determination that a contract of adhesion is unconscionable and

arguments, Plaintiffs' primary authority in support of these arguments, *O'Brien v. Star Gas Propane, L.P.*, 2006 WL 2008716 (App. Div. 2006), concerning whether a union-represented employee knowingly released certain discrimination claims against his employer, does not translate to the consumer contract context.[20]

However, Plaintiffs contend that Martin had a limited opportunity to review and consider the Release prior to assenting to its terms.  When asked at his deposition why he failed to read the Release, Martin testified that "there was about twenty people in line behind me and we were n a press for time to get the events started."  (Martin Dep. Tr. 44:6–10.)  And, when asked whether he saw any other individual sign the Release, Martin testified that "it was very, very rushed . . . [s]o there was no time, they was like -- they were like 'we need to get to the shooting location' . . . ."  (Martin Dep. Tr. 172:14–173:2.)  At this juncture, even if the Release was enforceable as to Plaintiffs' claims, there remains a question of material fact regarding whether Martin had a meaningful opportunity to review the agreement.  *See Delta Funding Corp.*, 189 N.J. at 40 (acknowledging that plaintiff alleged facts which suggested "a high level of procedural unconscionability" where signatory was "rushed" into signing the papers); *Miller v. Miller*, 160 N.J. 408, 419 (1999) (considering whether plaintiff was "rushed into signing" an agreement in determining that the agreement was unconscionable).

---

unenforceable, [the court] consider[s], using a sliding scale analysis, the way in which the contract was formed and, further, whether enforcement of the contract implicates matters of public  interest." *Stelluti*, 203 N.J. at 301 (*citing Delta Funding*, 189 NJ. at 39-40).

[20]     Plaintiffs also argue that the "language of the release was technical and cumbersome" and "[i]ts sentences were overly long and difficult to understand."  (Pls.' Opp, to HFC Mot. at 24; Pls.' Opp to G&H Mot. at 27.)  These arguments fail for reasons already discussed.  *See supra* at II.B.

## III.   CONCLUSION

For the reasons set forth above, Plaintiffs have demonstrated that they are entitled to summary judgment regarding Defendants' affirmative defenses of release and waiver, pursuant to Federal Rule of Civil Procedure 56(a).  Defendants' motions for summary judgment regarding those same affirmative defenses are denied.  An appropriate Order will issue.


 s/ Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge


Dated: December 31, 2021